UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**T.S. ENTERPRISE ASSOCIATES, INC.**
d/b/a Advanced Technologies Consultants,
*a Michigan corporation*,

      Plaintiff,

vs.

Case No.:
Hon.

**ERIC WILLIAM SHERILL**, *an individual*,

Mag. J.

      Defendant.

---

## <u>VERIFIED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF</u>

NOW COMES Plaintiff **T.S. Enterprise Associates, Inc. d/b/a Advanced Technologies Consultants** ("ATC") through its attorneys, Clark Hill PLC, and for its Verified Complaint for Injunctive and Other Relief ("Verified Complaint") against Defendant Eric William Sherill ("Defendant") states as follows:

### INTRODUCTION

1.    ATC—a leading distributor of name-brand technical training curricula, equipment, software, and furniture—brings this action for monetary damages and injunctive relief against its former employee, Defendant, for, among other things, Defendant's breach of the restrictive employment agreement between ATC and Defendant and Defendant's misappropriation of ATC's trade secrets.

## PARTIES AND JURISDICTION

2.     ATC is a Michigan corporation with its principal place of business in Wayne County, Michigan, within this District.

3.     Defendant is an individual residing within Travis County, Texas.

4.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000. In addition, this Court also has jurisdiction over ATC's federal Defend Trade Secrets Act claim pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1836(c) and supplemental jurisdiction over ATC's common law claims pursuant to 28 U.S.C. § 1367.

5.     This Court has personal jurisdiction over Defendant because, among other things, he transacted business within the State of Michigan, and tortiously acted, caused tortious acts to be done, and caused consequences of tortious acts to occur, within the State of Michigan. In addition, as part of the restrictive agreement between ATC and Defendant that is the subject of this action, Defendant stipulated to exclusive jurisdiction in this Court and waived any objection thereto. **Exhibit 1 ¶** 33.

6.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to ATC's claims occurred within this District, and because as part of the restrictive agreement

between ATC and Defendant that is the subject of this action, Defendant stipulated to venue in this Court and waived any objection thereto. **Exhibit 1** ¶ 33.

## STATEMENT OF FACTS

### Defendant's Employment and Restrictive Agreement with ATC

7.  ATC is a leading seller and distributor of name-brand mechanical, industrial, electrical, and educational equipment, software, and furniture manufactured by 17 separate manufacturers (see https://www.atctrain.com/manufacturer/).

8.  In addition, ATC provides numerous services, including curriculum programming, planning, selection, implementation and on-going training and support services, to implement the equipment, software, and furniture it sells and distributes.

9.  Defendant is a former employee of ATC.

10.  Prior to March 1, 2020, Defendant was associated with ATC as in independent contractor.

11.  Beginning March 1, 2020, Defendant transitioned to become directly employed by ATC as a Sales Representative on an at-will basis.

12.  In conjunction with the beginning of his employment as a Sales Representative, on March 2, 2020, Defendant signed an Employment Agreement with ATC (the "Restrictive Agreement"). A copy of the Restrictive Agreement is in

Defendant's possession and therefore need not be attached here but is nevertheless appended to this Verified Complaint as **Exhibit 1**.

13.    As set forth in Restrictive Agreement, Defendant's employment with ATC required him to perform certain services and duties, including, but not limited to: (a) identifying and pursuing potential business and contracts; (b) investigating inquires for the purchase of products and services referred by ATC to Defendant; (c) arranging meetings with and introducing ATC personnel to potential buyers of products and services; (d) assisting ATC in the preparation, submission, and negotiation of proposals and quotations for products and services; (e) installing certain "Products" (as defined in the Restrictive Agreement); (f) training ATC's customers to use "Products" sold; (g) collecting accounts receivable owed to ATC or to the manufacturers of the "Products" sold; and (h) performing other sales promotions activities as requested by ATC. **Exhibit 1 ¶** 2.

14.    The Restrictive Agreement required Defendant to refrain from providing services to any other individual or business entity other than ATC and to not have any interest in any business that was competitive with ATC's business activities during the term of the Restrictive Agreement (which term was continuous and indefinite). **Exhibit 1 ¶¶** 2, 23.

15.    In addition, the Restrictive Agreement included a "**Non-Competition**" provision, which prohibited Defendant, during the term of Defendant's employment

4

with ATC and for a period of 18 months following the voluntary or involuntary termination of his employment, "directly or indirectly, for himself or as an agent or employee of, or on behalf of, or in conjunction with any person, firm, corporation or other entity, or as partner of any partnership, [or] member of any limited liability company," from:

a.   Enticing, inducing or encouraging any manufacturers or customers of ATC with whom ATC does business either directly or indirectly to curtail, cancel or discontinue using ATC's services;

b.   Enticing, inducing or encouraging any referral sources of ATC, whether an individual or entity, to curtail, cancel or discontinue its or their relationship with ATC, or market or solicit business from any such referral sources;

c.   Divulging to any person, firm or corporation the names of manufacturers or customers of ATC, potential or prospective manufacturers or customers of ATC, or any prices or contract terms used by ATC or other information which would be prejudicial and/or detrimental to the best interests of ATC;

d.   Marketing, soliciting business, selling or providing presentations, products or services or any similar products or services provided by ATC to any manufacturer or customer of ATC for whom Defendant conducted any business or provided services either directly or indirectly on behalf of ATC;

e.   Advising, assisting, counseling or aiding a competitor of ATC in

5

selling, marketing or soliciting business from any manufacturer or customer of ATC for whom Defendant conducted any business or provided services either directly or indirectly on behalf of ATC;

f.      Calling upon, soliciting, consulting or performing services on behalf of or for the benefit of any manufacturers or customers or prospective manufacturers or customers whom ATC called on, solicited, consulted, provided services either directly or indirectly, or with whom ATC had contact;

g.      Contacting or soliciting, consulting, performing services, or assisting others to contact or solicit, consult or perform services, for the purpose of promoting any persons or entities which attempt to compete with ATC in any business carried on by ATC during the period which Defendant was employed;

h.      Participating as a director, officer, employee, agent, representative, or otherwise as a stockholder, partner or joint venture or having any direct or financial interest including without limitation, the interest of a creditor, in the form of any business which is directly or indirectly competitive with the business of ATC that exists on the date Defendant signed this Agreement or is expanded during his employment; or

i.      Participating as a shareholder, director or officer, employee, agent, representative, or otherwise of any corporation, entering into any business which is the same, like or similar to or competes with the business of ATC, or selling,

contracting to sell, or soliciting orders for any products that are the same, like, similar to, or compete with the products in Defendant's "Territory" (as defined in the Restrictive Agreement) or in any other territories where ATC routinely does business including, but not limited to, Arizona, California, Colorado, Idaho, Illinois, Indiana, Michigan, Montana, New Mexico, Nevada, Ohio, Oklahoma, Oregon, Texas, Utah, and Washington. **Exhibit 1** ¶ 16.

16.     For the purpose of the Restrictive Agreement's "Non-Competition" provision, "manufacturer" and "customer" included:

a.     anyone who was a manufacturer or client of ATC or with whom ATC had a business relationship of any kind, contractual or otherwise, on the date Defendant signed the Restrictive Agreement, or anyone who became a manufacturer or customer of ATC, or with whom ATC established a direct or indirect business relationship of any kind, contractual or otherwise, during the period of time Defendant was employed by ATC; and

b.     any prospective manufacturer or customer to whom ATC made a presentation (or similar offering of products or services) of any kind, or any prospective individual or entity with whom ATC attempted to establish a direct or indirect business relationship of any kind, contractual or otherwise, at any time during the eighteen (18) month period immediately preceding the termination of Defendant's employment. **Exhibit 1** ¶ 16.

17. The Restrictive Agreement also included a "**Non-Solicitation**" provision, which prohibited Defendant, during the term of his employment with ATC and for a period of 18 months following the voluntary or involuntary termination of his employment, from:

a. Recruiting, influencing, encouraging, inducing or soliciting, or attempting to recruit, influence, encourage, induce or solicit, any employee, agent, representative, or referral source of ATC to terminate his/her employment, contractual or other relationship with ATC or to work and/or provide services for or on behalf of any person or entity other than ATC;

b. Soliciting, offering employment to, contracting, otherwise attempting to hire, or assisting in the hiring of any employee, independent contractor, or officer of ATC;

c. Encouraging, inducing, assisting or assisting others in encouraging or inducing any such person or entity to divert employees, independent contractors, vendors, referral sources, or other business associates or partners to work for competitors of ATC; or

d. Interfering with the relationship between ATC and its employees, independent contractors, vendors, referral sources, or other business associates or partners. **Exhibit 1 ¶ 15.**

18. As part of the Restrictive Agreement, Defendant acknowledged and

agreed that, as part of employment with ATC as a Sales Representative, Defendant would be provided and have access to certain "**Confidential Information**" and "**Proprietary Information**," as those terms are defined in the Restrictive Agreement. **Exhibit 1 ¶¶** 12, 13.

19. With respect to "Confidential Information," Defendant acknowledged and agreed that it included any information which:

a. is, or is designed to be, used in the business of ATC or any manufacturer or customer; and/or

b. is private or confidential and derives independent actual or potential commercial value from not being generally known or available to the public; and/or

c. gives ATC or a manufacturer or customer an opportunity to obtain an advantage over competitors who do not know or use such information. **Exhibit 1 ¶** 12.

20. More specifically, Defendant acknowledged and agreed that "Confidential Information" included, but was not limited to:

Note templates, manufacturer and customer lists; contract terms, specifications and requirements; know-how, methodologies, technical, operational, marketing, accounting, or economic knowledge; customer pricing, supplier list or price, sales data or other records or lists used by ATC in the operation of its business; information, data or documents relating to both ATC's and a manufacturer's or customer's business; technical requirements, source codes and documentation for tools, software, systems, products or services of ATC; designs, information,

9

concepts, ideas, supply channels, methods of operation, conduct of business, operating record, sales and manufacturer and customer information; business policies or practices and business strategy; information received from others that ATC is obligated to treat as confidential, and other materials and information of a confidential nature, whether in written, oral, electronic, or in non-documentary form, and any information that may encompass any of the above.

**Exhibit 1 ¶ 12.**

21.    With respect to "Proprietary Information," Defendant acknowledged and agreed that it included: trade secrets; all written, printed, and electronic materials created and/or published by ATC; standards, designs, programs, and writings of any kind including software applications and pitch presentations; hand-outs; PowerPoint presentations; and methods of conducting business including marketing methods, marketing materials, letters, and advertisements written by ATC representatives.

**Exhibit 1 ¶ 13.**

22.    For the purpose of this Verified Complaint, ATC's "Confidential Information" and "Proprietary Information" will collectively be referred to as ATC's "Protected Information."

23.    The Restrictive Agreement provided that Defendant was: only permitted to use or retain Protected Information during his employment for the exclusive benefit of ATC; obligated to return, upon demand, any information and materials in Defendant's possession at any time during the term of and at the termination of his employment with ATC; and not permitted to use or disclose any

such Protected Information or any copies thereof after the termination of his employment with ATC. **Exhibit 1** ¶¶ 13, 14.

24.     In the Restrictive Agreement, Defendant expressly acknowledged that the Non-Competition, Non-Solicitation, Confidential Information, and Proprietary Information provisions of the Restrictive Agreement were "fair and reasonable and [we]re reasonably required for the protection of ATC and the good will associated with the business of ATC." **Exhibit 1** ¶ 19.

25.     Defendant further expressly acknowledged that Defendant's failure to perform and/or Defendant's violations of any of the obligations set forth in the Non-Competition, Non-Solicitation, Confidential Information, and Proprietary Information provisions of the Restrictive Agreement "will cause irreparable injury to ATC, which is not adequately compensated by money damages alone," and thus that "in addition to any other rights and remedies [ATC] may have, [ATC is] entitled to immediate appropriate injunctive relief, or decree of specific performance th[e] [Restrictive] Agreement, without the necessity of showing any actual irreparable injury or special damages." **Exhibit 1** ¶ 20. *See also id.* ¶ 14 ("[Defendant] also agrees that if the Proprietary Information is misused or used on behalf of [Defendant] or ATC's competitors, ATC would suffer material financial damage and irreparable harm.").

26.     In addition to monetary damages and injunctive relief, the Restrictive

Agreement permits ATC to recover its costs and expenses, including reasonable attorneys' fees, court costs, and out-of-pocket litigation expenses incurred in enforcing the Restrictive Agreement. **Exhibit 1** ¶ 20.

**Defendant's Resignation from and**
**Subsequent Unlawful Competition with ATC**

27.  On April 1, 2021, Defendant submitted a letter of resignation to ATC's President, Thomas S. Close.

28.  Shortly after, ATC demanded Defendant return all Protected Information in Defendant's possession.

29.  Almost immediately after voluntary resigning his employment with ATC, Defendant became employed with an Austin, Texas-based company called Toolkit Technologies Inc. ("Toolkit") as a "Career and Technical Education Consultant."

30.  As reflected on the State of Texas' Comptroller of Public Accounts' Taxable Entity Search ("Texas Entity Search"), Toolkit became registered to do business as of May 21, 2021. **Exhibit 2**.

31.  In addition, the Texas Entity Search reflects that Patrick Sherill— Defendant's brother—is Toolkit's "Registered Agent." **Exhibit 2**.

32.  Furthermore, the Texas Entity Search reflects that Toolkit's "Registered Office Street Address"—2002 Holly Street, Austin, Texas 78702—is the same as Defendant's residential address listed in the first paragraph of the

Restrictive Agreement. *Compare* **Exhibit 2** *with* **Exhibit 1**, at 1.

33.     As set forth on Toolkit's Certificate of Formation For-Profit Corporation filed with the State of Texas' Secretary of State, Defendant was identified as one of Toolkit's "directors." **Exhibit 3**.

34.     In or around July 2021, ATC began to learn information that Defendant, through Toolkit, was unlawfully competing with ATC in violation of the Restrictive Agreement.

35.     Following his voluntary resignation from ATC, Defendant deleted his LinkedIn "connections" with all ATC employees (except for his father, Bill Sherill, who was a former ATC sales representative).

36.     Following his voluntary resignation, Defendant deleted these LinkedIn "connections" for the purpose of preventing LinkedIn's algorithm from publishing Defendant's and Toolkit's unlawful activity (which Defendant and Toolkit posted and broadcast on LinkedIn) to ATC employees, managers, and owners that previously were "connections" with Defendant.

37.     As stated, ATC sells and distributes name-brand mechanical, industrial, electrical, and educational equipment, software, and furniture manufactured by 17 separate manufacturers.

38.     ATC does not sell, and does not provide services for, products manufactured by, among other manufactures, SMC International Training ("SMC").

39.     SMC describes itself as a "world leader in producing and supplying automation and pneumatic components" whose "products target universities, vocational training centres and technical training centres, plus major companies who provide their own training internally." *See* **Exhibit 4** (available at https://www.smctraining.com/webpage/indexpage/55).

40.     The products SMC manufactures are directly competitive with those manufactured by the manufacturers for which ATC sells and distributes and provides related services.

41.     Despite Defendant's attempts to hide his unlawful competitive activity, in or around July and August 2021, ATC learned from several of its existing customers—**North East Independent School District** (the second-largest school district in San Antonio, Texas, and tenth largest school district in Texas) ("NEISD"); **Dallas County Community College** (a seven-campus community college); **Odessa College** (a single campus technical college); and **Alamo Community College District** (a five-campus community college in San Antonio, Texas) ("ACCD")— that Defendant tried to solicit each to sell Career and Technical Education ("CTE") products and services that directly compete with those sold by ATC to these customers.

42.     In mid-July 2021, ATC learned that Defendant told Michelle Williams at NEISD that "the company"—referring to ATC—had changed names, and that

Defendant was now running the "new company."

43.     As Defendant conveyed the information to Ms. Williams, ATC's client-contact with NEISD now worked for Defendant.

44.     In late July 2021, ATC learned that Defendant and another unidentified representative of Toolkit visited Chris Wood, the Operations Manager of the Bill J. Priest Innovation Lab at Dallas County Community College, to discuss Toolkit and Defendant's new role working there.

45.     During this meeting, Defendant disparaged ATC and confirmed that Toolkit and Defendant were ATC's competitors.

46.     Defendant left Mr. Wood with a copy of Defendant's Toolkit business card.

47.     Later, on August 10, 2021, Defendant emailed Mr. Wood from eric@toolkittech.com as follows:

> As I mentioned [during our phone call], we are finalizing a brand new catalog. I've asked to be notified as soon as it is approved, at which point I will send it to you.
>
> With that said, I am attaching our manufacturer catalog directly from SMC. While not the most up to date, it does make up a great deal of the automation and advanced manufacturing training products we represent and can be found here:
> - SMC Catalog.pdf: https://digify.com/s/2zFLzg
> - SMC SIF-400.pdf: https://digify.com/s/8viPag
>
> For Dallas College's Advanced Manufacturing program, I truly believe SMC's SIF-400 (Smart Innovative Factory) would be an incredible solution for the mechatronics-related fields, as well as for studies in areas such as cybersecurity, Industrial Internet of Things, Robotics, and

more. The SIF-400 features every Industry 4.0 technology relevant to industry and showcases SMC's industrial relevance. I'd love to discuss in greater detail with you and Bafford and even set up a virtual demo. I think you'd both be very impressed.

Looking forward to discussing more!
. . .
Best,
Eric
National Sales Director | CTE Specialist

**Exhibit 5**.

48.    On August 12, 2021, Defendant emailed Mr. Wood again, this time providing additional information, including pricing regarding the equipment identified in his prior email. **Exhibit 6**.

49.    To this end, Defendant told Mr. Wood that the training system Defendant was offering was "very competitively priced, and we would like to think we can beat anyone else's prices for similar/comparable systems." *Id.*

50.    Defendant also offered Mr. Wood "ToolkitComplete Service," which included "installation, commissioning, training, and support" for any SMC products purchased through Toolkit. *Id.*

51.    On August 12, 2021, ATC also learned that Defendant had met with Dr. Shahrbanoo Farkhondeh, a professor in Instrumentation and Electronics at Odessa College, to inform him that Defendant was no longer working for ATC, that Defendant started Toolkit, and to solicit Dr. Farkhondeh to purchase competing equipment.

52.     To this end, Defendant provided Dr. Farkhondeh with one of his Toolkit business cards and related sales literature.

53.     In mid-October 2021, ATC learned that Defendant solicited several representatives of ATC's client ACCD (a five-campus community college in San Antonio, Texas).

54.     On October 13, 2021, ATC learned from Dr. Song, a department head at St. Philips College (one of ACCD's campuses), that Defendant had previously delivered her a copy of SMC's product catalogue.

55.     Dr. Song was surprised to see Defendant selling a new product because she had purchased "a lot of equipment" through Defendant and his father while they worked on behalf of ATC.

56.     On October 15, 2021, ATC learned from Donlee Wilson (the Chair of St. Philip's College's Allied Construction Trades Department) that Defendant was disparaging ATC and its owner, Mr. Close, and alluding that Defendant and Toolkit (unlike ATC) made customer satisfaction a top priority.

57.     Defendant knew NEISD, Dallas College, Odessa College, and ACCD were ATC's customers at the time of his voluntary resignation.

58.     Indeed, Odessa College was a customer Defendant specifically designated as one of "[Defendant]'s accounts" (for which Defendant would be entitled to receive continued commissions for a finite period following the voluntary

resignation of his employment resulting from Defendant's recent sales to Odessa College) in accordance with Paragraph 23 of the Restrictive Agreement.

59.    In addition, in or around October 2021, ATC learned that Defendant and Toolkit were advertising certain CTE products and services for sale and distribution that are directly competitive with those sold by ATC.

60.    In particular, in or around early October 2021, Defendant authored a LinkedIn post stating that "[it] felt great to be back in action this week after a long time away." **Exhibit 7**.

61.    Defendant's LinkedIn post included a hashtag—a keyword phrase used on social media to help those interested in the referenced topic find additional relevant posts—stating "#poweredbySMC." **Exhibit 7**.

62.    Accompanying Defendant's LinkedIn post was a video depicting a trade-show style exhibit booth with an SMC-manufactured CTE robot similar to the kind previously sold by Defendant on ATC's behalf (and currently sold and distributed by ATC). **Exhibit 7**.

63.    At the time ATC viewed Defendant's LinkedIn post, the post had 32 "Reactions" (including "Likes" and "Loves") from various CTE industry professionals, including an Odessa College professor and an employee of KUKA Robotics (which is one of the manufacturers for which ATC sells and distributes products and services, and is included as one of the "Products" manufacturers

defined in the Restrictive Agreement). **Exhibit 7**; **Exhibit 1**, at 14.

64.     In addition, around this same time, Toolkit authored its own LinkedIn post, which stated, "Excited about the next stage of innovation from Toolkit and SMC! Keep an eye out for big news to come," and which included a video that appeared to be the same trade-show style exhibit booth reflected in Defendant's LinkedIn post. **Exhibit 8**.

65.     Like Defendant's LinkedIn post, Toolkit's LinkedIn post included hashtags stating "#universalrobots" (in addition to other CTE references). **Exhibit 8**.

66.     Universal Robots is another one of the manufacturers for which ATC sells and distributes products and services, and is included as one of the "Products" manufacturers defined in the Restrictive Agreement. **Exhibit 1**, at 14.

67.     Finally, Defendant also posted in early October 2021 that "yesterday" he "had the privilege of seeing the new Virtual Training Simulator of SMC International Training's Industrial Controls Training System in action," and that Defendant was "very excited to see these types of technologies and training systems continue to be implemented in schools trying to change the future of #manufacturing. #poweredbysmc." **Exhibit 9**.

68.     While employed at ATC, Defendant had access to a list of purchasing cooperatives in Texas (among other states) in which ATC was a member.

69.    Membership in these purchasing cooperatives was competitively advantageous to ATC because membership: (1) permitted ATC to receive notification of, and participate in bidding on, certain projects related to the goods and services ATC sold that were offered by other members; and (2) allowed ATC to avoid the bidding process if the party seeking bids and the bidder were both members of a particular purchasing cooperative.

70.    It took ATC several years to develop its membership in and this list of purchasing cooperatives.

71.    Since voluntarily resigning, Defendant has been registering Toolkit with numerous of the same purchasing cooperatives in which ATC is a member for the purpose of competing for the same contracts offered to ATC.

72.    As previously identified, ATC presently knows that Defendant, through Toolkit, is attempting to solicit business from and interfere with ATC's current and prospective customers and clients, and is attempting to unlawfully compete in violation of the Restrictive Agreement.

73.    Upon information and belief, in addition to Defendant's intention to solicit business from and interfere with ATC's current and prospective customers and clients and Defendant's otherwise unlawful competitive activity in violation of the Restrictive Agreement, Defendant is also using and/or preparing to use ATC's confidential, proprietary, and trade secret Protected Information to compete with

20

ATC.

74.     If Defendant is not enjoined from violating and/or interfering with the Restrictive Agreement and/or misappropriating ATC's trade secrets, ATC will suffer substantial and irreparable harm, including but not limited to the continued loss of confidential, proprietary, and trade secret information, clients and prospective clients, and goodwill.

## COUNT I—Breach of Restrictive Agreement

75.     ATC realleges all the foregoing paragraphs as if they were fully restated herein.

76.     The Restrictive Agreement is a valid, binding contract supported by valuable consideration.

77.     ATC has fully performed its obligations under the Restrictive Agreement.

78.     By virtue of Defendant's aforementioned conduct, Defendant has breached his contractual obligations under the Restrictive Agreement.

79.     As a direct and proximate result of Defendant's breaches of the Restrictive Agreement, ATC has suffered substantial economic injury, loss of goodwill, harm to its business reputation, loss of esteem and standing in the community, and loss of business opportunities.

## COUNT II—Violation of the Federal Defend Trade Secrets Act

80.     ATC realleges all the foregoing paragraphs as if they were fully restated herein.

81.     ATC's confidential, proprietary, and trade secret information includes its client lists and contact information, the details of its client contracts, pricing for products and services, cost and profit structures, solicitation and presentation procedures and information, and employee information.

82.     This confidential, proprietary, and trade secret information individually and collectively constitutes a "trade secret" within the meaning of the federal Defend Trade Secrets Act (*i.e.*, 28 U.S.C. § 1839(3)).

83.     ATC has taken reasonable measures to keep such confidential, proprietary, and trade secret information secret.

84.     ATC's confidential, proprietary, and trade secret information derives independent economic value from not being generally known and not being readily ascertainable through proper means by another person who can obtain economic value from the disclosure or use of the information.

85.     ATC's confidential, proprietary, and trade secret information is related to services used in, or intended for use in, interstate commerce.

86.     Defendant misappropriated ATC's confidential, proprietary, and trade secret information by disclosing and using (and planning to disclose and use) said

information without express or implied consent.

87.     At the time Defendant disclosed and used (and planned to disclose and use) ATC's confidential, proprietary, and trade secret information, Defendant knew or had reason to know that he acquired said information through improper means and under circumstances giving rise to Defendant's duties to maintain the secrecy of said information and limit its use.

88.     Defendant's misappropriation of ATC's confidential, proprietary, and trade secret information was willful and malicious.

89.     As a direct and proximate result of Defendant's willful and malicious misappropriation of ATC's confidential, proprietary, and trade secret information, ATC has suffered and will continue to suffer actual damages, and Defendant has been unjustly enriched.

90.     As a direct and proximate result of Defendant's willful and malicious misappropriation of ATC's confidential, proprietary, and trade secret information, ATC is entitled to an award of actual damages, including but not limited to the value of the unjust enrichment caused by Defendant's misappropriation and benefit therefrom, in an amount to be determined at trial.

91.     As a direct and proximate result of Defendant's willful and malicious misappropriation of ATC's confidential, proprietary, and trade secret information, ATC also seeks an award of exemplary damages, attorney's fees, and costs.

92.     As a direct and proximate result of Defendant's willful and malicious misappropriation of ATC's confidential, proprietary, and trade secret information, and to prevent actual or threatened misappropriation of such information, ATC also seeks injunctive relief pursuant to 18 U.S.C. § 1836(b)(3)(A).

## COUNT III—Violation of the Michigan Uniform Trade Secrets Act

93.     ATC realleges all the foregoing paragraphs as if they were fully restated herein.

94.     ATC's confidential, proprietary, and trade secret information includes its client lists and contact information, the details of its client contracts, pricing for products and services, cost and profit structures, solicitation and presentation procedures and information, and employee information.

95.     This confidential, proprietary, and trade secret information individually and collectively constitutes a "trade secret" within the meaning of the Michigan Uniform Trade Secrets Act (*i.e.,* M.C.L. § 445.1902(d)).

96.     ATC has taken reasonable measures to keep such confidential, proprietary, and trade secret information secret.

97.     ATC's confidential, proprietary, and trade secret information derives independent economic value from not being generally known and not being readily ascertainable through proper means by another person who can obtain economic value from the disclosure or use of the information.

98.    Defendant misappropriated ATC's confidential, proprietary, and trade secret information by disclosing and using (and planning to disclose and use) said information without express or implied consent.

99.    At the time Defendant disclosed and used (and planned to disclose and use) ATC's confidential, proprietary, and trade secret information, Defendant knew or had reason to know that he acquired said information in confidence from ATC, through improper means and under circumstances giving rise to Defendant's duties to maintain the secrecy of said information and limit its use.

100.    Defendant's misappropriation of ATC's confidential, proprietary, and trade secret information was willful and malicious.

101.    As a direct and proximate result of Defendant's willful and malicious misappropriation of ATC's confidential, proprietary, and trade secret information, ATC has suffered and will continue to suffer actual damages, and Defendant has been unjustly enriched.

102.    As a direct and proximate result of Defendant's willful and malicious misappropriation of ATC's confidential, proprietary, and trade secret information, ATC is entitled to an award of actual damages, including but not limited to the value of the unjust enrichment caused by Defendant's misappropriation and benefit therefrom, in an amount to be determined at trial.

103.    As a direct and proximate result of Defendant's willful and malicious

misappropriation of ATC's confidential, proprietary, and trade secret information, ATC also seeks an award of exemplary damages, attorney's fees, and costs.

104. As a direct and proximate result of Defendant's willful and malicious misappropriation of ATC's confidential, proprietary, and trade secret information, and to prevent actual or threatened misappropriation of such information, ATC also seeks injunctive relief pursuant to M.C.L. § 445.1903.

## COUNT IV—Tortious Interference with Contract

105. ATC realleges all the foregoing paragraphs as if they were fully restated herein.

106. ATC has contractual relationships with its clients for the sale and distribution of mechanical, industrial, electrical, and educational equipment, software, and furniture, and the provision of various services, including curriculum programming, planning, selection, implementation and on-going training and support services, to implement the equipment, software, and furniture it sells and distributes.

107. Defendant is and was aware of these contractual relationships.

108. Defendant intentionally and improperly interfered with, and will intentionally and improperly interfere with, these contractual relationships, including, but not limited to, by using ATC's confidential and proprietary information to compete with ATC and solicit business from its clients, including by

recommending that ATC's clients terminate their contractual relationships with ATC and sign new contractual relationships with Defendant's new employer;

109.   Defendant's intentional and improper conduct was and is *per se* wrongful and/or was done without justification and for the sole purpose of interfering with ATC's contractual relationships.

110.   As a direct and proximate result of Defendant's intentional and improper acts of tortious interference, ATC has suffered substantial economic injury, loss of goodwill, harm to its business reputations, loss of esteem and standing in the community, and loss of business opportunities.

## COUNT V—Tortious Interference with Business Expectancy

111.   ATC realleges all the foregoing paragraphs as if they were fully restated herein.

112.   ATC enjoys valid business relationships and expectancies with its customers and prospective customer accounts.

113.   These business relationships and expectancies have a reasonable likelihood of future economic benefit to ATC.

114.   Defendant is and was aware of these business relationships and expectancies.

115.   Defendant intentionally and improperly interfered with, and will intentionally and improperly interfere with, these business relationships and

expectancies, including, but not limited to, by using ATC's confidential, proprietary, and trade secret information known to Defendant to solicit ATC's customers and clients and compete with ATC for customers and clients.

116.   Defendant's intentional and improper conduct was and is *per se* wrongful or was done without justification and for the sole purpose of interfering with ATC's business relationships and expectancies.

117.   As a direct and proximate result of Defendant's intentional and improper acts of tortious interference, ATC has suffered substantial economic injury, loss of goodwill, harm to its business reputations, loss of esteem and standing in the community, and loss of business opportunities.

### COUNT VI—Unjust Enrichment/Quantum Meruit

118.   ATC realleges all the foregoing paragraphs as if they were fully restated herein.

119.   By virtue of his aforementioned intentional misconduct and improper interference with ATC's confidential, proprietary, and trade secret information and customers and prospective customers, Defendant has received a substantial benefit from ATC.

120.   Defendant's retention of funds he has or will earn through his use of ATC's confidential, proprietary, and trade secret information, or through his tortious interference with ATC'S contracts and business expectancies allowed or will allow

Defendant to become unjustly and inequitably enriched to the detriment of ATC.

121.   Under the circumstances, it is inequitable for Defendant to retain the benefits he has received or will receive from his intentional misconduct and improper interference with ATC's confidential, proprietary, and trade secret information and customers and prospective customers without approval or agreement from ATC.

122.   As a direct and proximate result of Defendant's wrongful conduct, ATC has suffered substantial economic injury, loss of goodwill, harm to its business reputations, loss of esteem and standing in the community, and loss of business opportunities.

**REQUEST FOR INJUNCTIVE RELIEF AGAINST DEFENDANT**

123.   ATC realleges all the foregoing paragraphs as if they were fully restated herein.

124.   Defendant's misappropriation of ATC's confidential, proprietary, and trade secret information constitutes a transgression of a continuing nature, for which there is no adequate remedy at law.

125.   Defendant's breaches of his contractual obligations to ATC constitute transgressions of a continuing nature, for which there is no adequate remedy at law.

126.   Defendant, through and because of ATC, has developed goodwill with ATC's clients and prospective clients.

127.   Unless restrained and enjoined, preliminarily and permanently, Defendant will continue to use ATC's confidential, proprietary, and trade secret information on behalf of himself and his new employer to compete with ATC for ATC's contractual relationships and business relationships and expectancies.

128.   Unless Defendant is restrained, his actions will also continue to cause non-quantifiable and irreparable damages to ATC's goodwill and long-standing contractual relationships, and business relationships and expectancies.

129.   The harm to ATC in the absence of an injunction substantially outweighs any alleged harm to Defendant if an injunction is issued.

130.   The public interest will not be harmed if an injunction is issued.

## RELIEF REQUESTED

For all the foregoing reasons, ATC, through its attorneys, Clark Hill PLC, respectfully requests that the Court enter judgment against Defendant as follows:

**A.    LEGAL RELIEF**

1.   Compensatory, economic, noneconomic, exemplary, and punitive damages in whatever amount ATC is found to be entitled; and

2.   An award of interest, costs, and contractual attorney fees.

**B.    DECLARATORY AND EQUITABLE RELIEF**

1.   An order out of this Court preliminarily and permanently enjoining Defendant from misappropriating ATC's trade secrets and enjoining Defendant from violating the restrictive covenants in the Restrictive Agreement;

2.  An award of exemplary damages, punitive damages, interest, costs, and contractual attorneys' fees; and

3.  Whatever other declaratory and/or equitable relief appears appropriate at the time of final judgment.

Dated: October 22, 2021

Respectfully submitted,
**CLARK HILL PLC**
*/s/Benjamin I. Shipper*
**Connie Cessante (P40935)**
**Benjamin I. Shipper (P77558)**
500 Woodward Ave., Suite 3500
Detroit, Michigan 48226
(313) 965-8300
ccessante@clarkhill.com
bshipper@clarkhill.com
*Attorneys for Plaintiff*

## VERIFICATION/DECLARATION

STATE OF MICHIGAN     )
                                ) ss
COUNTY OF WAYNE       )

     I depose and state that I am a representative of T.S. Enterprise Associates, Inc. d/b/a Advanced Technologies Consultants ("ATC"); that I have the requisite authority to verify, and act as a Declarant in support of, the aforementioned Verified Complaint for Injunctive and Other Relief ("Verified Complaint") on behalf of ATC; that I have read the factual allegations contained in the foregoing Verified Complaint, and have knowledge of the allegations contained in it; and that I declare under penalty of perjury under the laws of the United States of America that the factual allegations contained in the foregoing Verified Complaint are true and correct.

               T.S. ENTERPRISE ASSOCIATES, INC.
                 d/b/a Advanced Technologies Consultants
               By: Thomas S. Close
               Its: President

Executed on: _October 22, 2021_

**LISA M HUNTER**
NOTARY PUBLIC - STATE OF MICHIGAN
COUNTY OF WAYNE
My Commission Expires March 10, 2024
Acting in the County of Wayne